Thank you. In relation to 5956-Grimm Acquistition L too vs. EQT production company oral armeon is not included in the contract but is for non-terminal benefits rogen deo Hang on a second until everybody gets seated. You may proceed. Thank you. Good morning, your honors. May it please the court, I'd like to reserve three minutes of time for rebuttal. Your honors, this is a very messy factual backdrop to this dispute, but there's really some critical errors that the district court made en route to a $14 million judgment. And what's most significant in the appeal is that Journey does not defend some of those errors that are quite significant. I'm going to start, your honor, with the contract interpretation issue. Really, there's a lot we briefed about. I think the easiest way to encapsulate the problem is the lease has three separate descriptions of what the property is, and they are all inconsistent. There is the reference to the PSA. There is the separate reference to the attachment to the lease. And then there's a reference to the maps that are attached to the lease. Attachment, is that Exhibit A? That's Exhibit A, your honor. And then A1 are the maps. All three of those descriptions are inconsistent. If A1 is the maps, what's Exhibit N? Exhibit N is in the PSA, your honor. So the lease is attached to the PSA. Exhibit N, because you're relying on Exhibit N, it seems in the brief, is that the same thing as the map you just called A1? Yes, your honor. But then the difference is that Exhibit A to the lease correlates to Exhibit J in the PSA, and those are not the same. So you have three different descriptions, all of which are inconsistent. Secondly, Well, it depends upon whether they are materially inconsistent or what the inconsistencies are. I mean, it doesn't really help us much just to say they're inconsistent. Well, there are material inconsistencies because that's what has given rise to this entire dispute. And I would also say that the other thing that, again, the easiest way to understand the inconsistency here is when the reference in the PSA, the KRCC properties, those use the term capitalized properties, but everyone agrees those are just within the blue lines. However, that same term, capitalized properties, is used throughout the PSA, and Journey says it means something else in the balance of the PSA. So, again, you have terms meaning different things at different points in time if Journey's interpretation is upheld. And all of these show why there is an inconsistency here. And, of course, the court, to try to resolve the inconsistency, relied on the canon of construction against the drafter. Journey does not defend that on appeal and says instead, well, you know, those were throwaway. It might help us if you put some of these statements you're making in context, instead of just talking obliquely or generally about inconsistencies, if you were to show us or explain what the court found or overlooked regarding these documents and why that's important. But I'm not getting much out of you just saying things are inconsistent and things are inconsistent. If you could get more specific, that might be very helpful. Sure. So let me try it this way, Your Honor. The maps that exhibit A-1 to the lease show a narrower, depict a narrower universe of the properties than the maps that are attached as A-1. Not the maps. A is a written exhibit. I'm sorry. I misspoke. It was A-1 are the maps. A are the descriptions. So A has a broader description than the maps. And then the third description in the lease is it refers back to the PSA. And the PSA has an altogether different list of the properties. It's Exhibit J. And there are differences. There are additional properties that are listed in the lease on Exhibit A. Wait. J is not a listing. J is the map, right? No. Exhibit N is the map. Exhibit N is the map. Right. Wait. What's the exhibit? Is there an Exhibit J or A? I'm sorry, Your Honor. Again, there's multiple different exhibits here. I'm trying to keep them separate. A and N are with the PSA. A is the listing of all the properties. But that's to the lease, Your Honor, not to the PSA. Isn't there an Exhibit A to the PSA? There is, Your Honor. All right. That's a listing of all the properties. That's correct, Your Honor. Okay. And Exhibit N is in the PSA but not generally. That is an attachment referring to the further assurance clause, right? That's correct. That's correct. Now, isn't that significant if that's limited to just the further assurance clause? Well, I think what's interesting about that is, as we explained, it makes no sense to have a further assurances clause that does not embrace the totality of the transaction. Well, Journey says there's a reason for that in the Exhibit N, which is the map with the blue lines, because those were the most valuable properties. Exactly. They wanted further assurance. They were going to be sure to get all of those even if some of those were somehow through sloppiness omitted. Right. But I think the problem with that is they're relying on extrinsic evidence to prove that point up. Our whole point is there should be extrinsic evidence here allowed to elucidate the meaning of the contract. They're relying on it to give their interpretation of Exhibit N, which is exactly what the district court did. The district court cited, you know, relied on Journey's argument about extrinsic evidence for why the further assurances clause doesn't mean what we normally think of a further assurances clause. And then the district court invoked the canon of construction against the drafter, which, again, they do not defend on appeal. So we think that those are significant errors that highlight the ambiguity and the internal tension here. Judge Clay, going back to your question, recall that the definition properties specifically incorporates the lease. It's all a little bit circular, but if the lease has problems in it and inconsistencies, and it does, then that impacts the entirety of the definition in the PSA of what properties are. Counsel, with the N Exhibit A, you know, it doesn't contain any descriptions itself. Are the references to book and page, are those to the county clerk's property records, or what are those references?  But, I mean, you know, when I started this, I said, oh, I'm going to find someplace where it has meets and bounds or the northwest one quarter, and I would assume that that's correct. LB, I don't know if that's land book or Leslie book or lease book, or perhaps the adversaries can tell me. Okay, fine. At least you're not quarreling that that is a written description somewhere. Of course not. Okay, of course not. I want to shift real quick, Your Honors, to the evidentiary exclusion. I think this is very significant because this is one of the other grounds that Journey does not defend. They do not try to reconcile the court's reliance on 403 with the basic test under 403 or this court's precedent under 403, and there's a reason for that. This court has to maximize the probative value and minimize the prejudicial effect. There's no dispute that the court excluded evidence of EQT's intent and understanding leading up to the consummation of that contract. Kentucky law on willful trespass places the burden on EQT, and it says we're going to consider the totality of the circumstances, and that's what we were trying to prove. In fact, the Howard case from Kentucky in 1987 says that you have to give the alleged willful trespasser the opportunity to prove the trespass was innocent, and that's what we were trying to do. The big problem I see with your position is that the testimony from, what, Miller, was he one of your vice presidents? It was Morris. Morris. Excuse me, Mark. All of this relates to the 2001 agreement. That's when the agreement was formed. But the trespass wills, all that took place between 2006 and 2011. So for you to use 2001 intent to relate to 2006 to 2011, can't the judge say, hey, wait, they were intervening events and all this and weighing 403 and all that? You don't get to testify. So two responses to that. First, the Herod case from the Kentucky Supreme Court a couple years ago. It involved a 2002 trespass and considered evidence back to 1991. So there's no restriction on how far you can go back. And what's critical here, Your Honor, is that EQT was never able to answer the why question. Why did you have this understanding? Why did you base your belief on these maps? And that's what this extrinsic evidence would have showed. In fact, Journey, in its closing argument, mocked Mr. Morris because he couldn't answer that question. They attacked Mr. Shockley because he didn't subsequently map these properties. But the reason was was because he understood pre-contract that it were these maps that were in the data room. So there was no need to do that. But he wasn't able to tell that story. And then in closing, Journey points to the contract and says, look at this contract. There's no provision in here that says it's these maps that control. But, of course, if EQT had been able to get its testimony in about its understanding, it could have answered that question. And certainly under, as what Herod said, it's a broad conceptualization of totality of the circumstances. We, as the trespasser, bear the burden there, and that's all the more reason to allow this evidence. The district court said, well, I'm concerned this might waste time. I mean, the universe of testimony here probably consumes less than two hours. We're talking about a week-long trial. It's not going to lead to weeks and weeks of additional testimony. And the other thing the judge said is I'm concerned about you attacking my ruling on the contract. Well, there's no inconsistency by saying the judge's rule of the contract means X. And we understood it to mean Y. That is indicative of good faith. I mean, that happens all the time. Parties misunderstand or misinterpret contracts. Counsel, a minute ago you cited a case for bringing in earlier testimony of intent. Was that Herod concrete? Herod, yes, Your Honor. Okay, because it looks like it's cited in your blue brief, but maybe not for that same proposition. I wasn't citing it for that proposition. It is relevant to many other things, including, if I have a minute, pre-judgment interest. And I think that's another critical aspect here. A $5 million pre-judgment interest award, they only devote a page of that to their brief. This court has recognized that pre-judgment interest under Kentucky law is a very rare remedy. And why Herod is significant there is I take it the mathematics aren't in dispute. And by correct, in effect, the pre-judgment interest means, if they win on the other points, you stole my oil in 2008 and it was worth $1 million and I don't get my money until judgment until 2015. Why shouldn't they get interest for that? You had their money for seven years. Well, because I think that's where Herod is significant. It says, unlike a normal case where you say, all right, I was damaged by this amount. I get to deduct my expenses. You get the net profits. In a willful trespass case, you don't get to deduct expenses. And so what that means is there was less than $4 million of what we would think of as compensatory damages. You stole $1 million, but it cost you half a million to do it. Right. And so you add the 5.4 on, which is a punitive measure. And what Herod said is that is a sufficient penalty for a willful trespasser. So you should not get prejudgment interest on top of that. Thank you, Your Honor. We'll have your time for rebuttal. How will you divide your time? Oh, I'm sorry. I'm doing it all. You're doing it all. Okay, that's fine. Thank you. May it please the Court, I'm Elizabeth Kerr representing Journey Acquisition, the Eppley in this case. It's really a very simple situation. It's a lot of money involved, $64 million. You've got leases scattered over three counties, actually five counties, which I'll get to in a minute because I think that that fact totally undercuts EQT's ambiguity argument. But at the end of the day, Judge Van Tatenhove did exactly the right thing. He read the four corners of the contract. That is his first role as an interpreter of it. He read it. He found no ambiguities. And EQT has still not pointed to any ambiguities in terms of what's really important here. They're saying the exhibit in further assurances maps was meant to be coextensive with everything that was conveyed, and yet they cannot point to a single provision within any of the documents that could be read that way. And that's the test for ambiguity. Is there something that you can reasonably ascribe a different reasonable interpretation to? And they simply do not have that here. If I could take just a second to maybe put a little bit of this into context, because there is a lot of confusion, Exhibits A and all that sort of stuff. The PSA, that is simply the agreement whereby parties say, we're going to agree to make an agreement down the road. We've got the parameters of this, but there's a due diligence period, two months. So they enter into a PSA in October of 2001, Journey and EQT, where they say, okay, we're going to have this due diligence period of two months. EQT is going to scrub. That was one of the words used by its employee, Cindy Perdue. That was her job during this two-month period was to scrub the property descriptions, not the maps, the property descriptions to make sure that everything in there accurately reflected what EQT was going to sell to Journey. That's exactly what EQT did. Now, the resulting documents two months later, when they executed the master assignment of the third-party leases and all the pipeline facilities within the Blue Lines, the leases were out. I think the evidence shows that there were 35 properties altogether that had acreage outside the Blue Lines, both third-party lease and fee properties. Now, I know that demonstrative aids are usually not used in oral argument up here, but I do have a map. I think it's easy to see. We did put a couple of small maps in our brief, but I don't know if it would help the court to get a visual of this. I can haul it up from the back, but I'll keep going. Probably not, unless my colleagues do. But would you answer that are the deed book pages, et cetera, and the LB pages, is that where you would go to find the meets and bounds? Exactly, Your Honor. And the important thing about, well, let's take Exhibit A to the PSA is the third-party leases. Exhibit A to the master assignment that was the formal document by which those were assigned, that's also Exhibit A. But they contain the listings, and the most important thing there is the lease number and the acreage amount. For instance, the Fordson lease. That was the first one that Journey discovered there was something really wrong with when it started looking at the documents after it had assumed for a number of years that its operations guy in Kentucky had actually mapped out what's on the exhibits, the lease boundaries and the fee track boundaries. But he had not done that, as we know, of course. But when you look at Fordson, every EQT witness agreed that when you see lease number 240573, that means the entire Fordson lease in all three counties, and it means 6,333 acres. EQT didn't have a subpart A, B, and C for Letcher, Leslie, and Perry County on Fordson. Fordson is 6,333 acres. And, in fact, EQTs, people recognized that in 2006, of course, as we know when I get to talking about the bad faith of EQT. But on the ambiguity, not only do they not point to the provision, as I said, that would indicate that Exhibit N circumscribed everything, but there were two counties in western Kentucky, Crittenden and Hopkins, where EQT assigned to Journey leases and producing wells. In fact, the Exhibit D to the PSA, which listed all the wells that EQT was going to assign to Journey, and I think there were some 435 of them, the first 14 listed are in Crittenden and Hopkins County. And yet, if you go to Exhibit N, you go to any map in this case, you will not find anything in Crittenden and Hopkins counties. They're 250 miles away, probably. Exactly, and they're not part of the same lease. In other words, leases can, like Fordson, be scattered. You don't have to have all contiguous property. But Hopkins and Crittenden, those properties, those tracts, were not part of any lease that related to Leslie Ledger or Perry County, which, of course, we have the blue lines for. And EQT has never explained how in the world Journey got good title to anything in Hopkins or Crittenden, because if Exhibit N means everything, that means we really didn't get it, and it was a sham transaction. But Exhibit N is, as the court pointed out, very specifically targeted to the further assurances. EQT wants the court to think that, well, Journey just thought it was getting all this other property for free and it didn't care, or else it would have put it into Exhibit N. But EQT overlooks the fact that in both the assignment and when EQT leased its fee properties to Journey, there were special warranties of title in there. It's not like they would have just dropped off the face of the earth if something had been wrong with it. EQT warranted title and then gave Journey the further assurance because of the importance of what was inside those blue lines. That's where all the infrastructure was. You know, when you're an operator, you don't just go sink a well out where there's no pipeline, no gathering lines, no nothing, unless you're just doing a total wildcat. What you do is when you make an acquisition like this is you start where the low-hanging fruit is, you know, where you know you've got production. And that's exactly what happened here. Tell us about their argument about the Rule 403 blunder by the court, alleged blunders. Alleged blunder, yes. I would highlight alleged there. In context, number one, it was not a blunder. And number two, even if all that evidence had come in, I don't care under what standard, it would not have made the slightest difference to the jury verdict. And Judge Van Tatenhove did not exclude that evidence solely on any grounds that it might have been prejudicial to Journey's case. He also said it would potentially mislead the jury and waste time. Now, in the first pretrial conference that we had on August 25th, I think it's in the record at 249, counsel for EQT was asked the question, if I let this pre-2001 intent evidence in, isn't that going to basically make the trial the same scope as if I hadn't entered summary judgment motions? And the answer from EQT counsel was yes. So it would have not added just a couple of more hours of testimony. It could have potentially dragged this thing on forever in a very misleading way. But EQT's pre-2001 intent doesn't make a difference for at least a couple of reasons. Number one, the jury knew. If they were halfway awake, they understood because everybody was talking about, well, after the 2001 transaction, here's what EQT understood. We had these blue lines. We thought that that was all we had conveyed. And that's where we tried to be really careful not to drill inside, even though they did do it twice, as it turns out. And then Mr. Shockley, of course, he agreed on cross-examination that he assumed, after the transaction, that the blue lines meant everything. And if you look at the blue lines on the post-2001 transaction maps that Mr. Morris testified about, all you have to do is compare them to exhibit N, and you'll see that they're basically the same maps. So I don't know how the jury could have missed that fact. But what was really surprising is Mr. Shockley said that he didn't map the properties to see whether what Journey bought actually was only within the blue lines, as he assumed. He actually said he didn't know and he didn't care. Now, the Journey people back in Fort Worth who, once Mr. Shockley left for EQT, they took all the files in-house in Fort Worth and started looking at this stuff and realized, we thought that this guy knew what he was doing, but apparently he did not. So you have the fact that the jury understood how the exhibit N maps related to the maps that were shown later. But more important is the totality of the circumstances, yes, you want to look at that in a willful trespass setting, but it's the time of the trespass. What did the trespasser know at the time of the trespass that might have made its earlier intent reasonable or unreasonable? And here we proved and the jury accepted the fact that it was totally unreasonable. EQT, as you'll recall, paraded in front of the jury, I don't know, probably 30 title opinions altogether, trying to say, well, yes, we always had good title before we drilled. But the way I kind of look at it is, I don't know how familiar the court is with well units, but what you have in Kentucky is you've got a 500-foot radius around a gas unit, a gas well. And I think it's 330 feet around a gas, an oil well, excuse me. And so that's about 18 acres, I believe, if I can do pie math correctly, which, meh, about 18 acres. And a lot of times when you go to drill a well, part of that 18 acres, you know, sometimes many parts of it will be owned by different people. And those different tracts are what constitute the well unit. And you've got to have good title to every single tract in that well unit to make sure that you're not trespassing. And EQT put in these title opinions, but then on cross-examination, every one of its witnesses had to answer the question, okay, you were giving title on this tract, and is that a tract that Journey has an interest in? Well, no. So it really doesn't matter to this case, right? Yeah, that's correct. I mean, it's kind of like, you know, we've all played Trivial Pursuit, I imagine, and you've got the pie and the wedges where you have to answer all the questions. Well, you know, EQT says, well, we got history and we got arts and literature, but you didn't get science and nature, and that's what Journey owns. You didn't put that piece of the wedge into the pie. And I think the jury was rightly offended by that, in addition to the fact that they relied, in one case, on a title opinion from 1961 on a Journey tract. Now, in EQT's reply brief, they try to suggest that, in fact, oh, there was a 2004 opinion. That dealt with a totally different tract. And then you've got people like Dale Phillips and Jim Kaiser going into Perry County multiple times. The county that EQT for years said, that's all Journey got was Perry County. They trespassed in there three times, agreed at trial that there were, in fact, assignments recorded to Journey in Perry County, and they just chose to ignore them. That's what Kaiser said. Mr. Phillips said, well, you know, when I'm running title, I just run it up to the time that the lease was executed. Everybody else said that makes totally no sense, because it doesn't. You know, to avoid a trespass, the lessee, the driller, has to know that you've got good title at the very second the drill bit goes into the ground. So from all the evidence of title opinions, EQT double sold property. You know, it conveyed some property to Journey in 2001. And the very next year, it sold that same property to a company called DPI, which then unwittingly drilled four trespass wells. I mean, the proof of EQT's bad faith or lack of good faith was crushing. And I don't see how allowing witnesses to say, well, this is what we intended going into 2001, would have made a darn bit of difference. In fact, one of the cases EQT cites, the Stockman v. Oakcrest dental case, this court discussed what prejudice means in the context of exclusion of evidence and harmless error. And the definition of prejudice there is there's a substantial risk that the jury made a determination of liability on an improper basis, i.e., if the rest of the evidence did not clearly support a finding of liability. And we submit that, of course, that's exactly what happened here. Just a quick word on the prejudgment interest. That's not punitive. Herod Concrete dealt with real punitive damages. And Herod Concrete said, when you've got a willful trespass, trespasser doesn't get to deduct its drilling costs. And so that's what that case was about. EQT is calling prejudgment interest punitive, but it's not. Help me about his response, because I thought I was good on the math there when I said, you stole a million, you had it for seven years, so you ought to pay interest on it. And his response was, well, it cost us half a million to steal the million, so we should only get that much. There's a distinction to be drawn here between the further assurances interest and the trespass interest. The further assurances, that was what Judge Van Tatenhove compounded from 2001, because those were clearly. But that's compounded versus simple, right? Or that for that universe of damages, the further assurances. And, you know, equitably, I believe he had ample reason to do that, because when we brought those further assurances properties to EQT's attention, they keep saying, oh, the blue lines mean everything. And we said, hey, here's some stuff in the blue lines. And they say, you can't have it. We're not going to give it to you. So we have to go through a trial on latches, even though we sued for those interests within the 15-year statute of limitations. My time is up. Go ahead and answer that. Okay, thank you. Now, on the trespass damages prejudgment interest, which Judge Van Tatenhove decided to make only simple, even though we had asked for compounded, these trespass wells were drilled at various times. Because of the statute of limitations, we were only able to recover damages from 2006 forward. You go back five years from when we raised the claim. And EQT, we didn't get reimbursed for EQT's cost of drilling. They didn't have to pay us that. We only got five years' worth of damages. And in wells, the early production is always the strongest, because that's when you need the pressure. You sink something in the pressure, and that's when you get the best production. We didn't get any recovery for that. We got the five years later. And so because of the damages calculations that EQT stipulated to, and because of the way it conducted itself as a company in dealing with these trespass wells and denying and delaying and misrepresenting things, I believe that Judge Van Tatenhove was well within his discretion. So that was really kind of equitable relief that the district court granted? Well, prejudgment interest in this case where it's unliquidated damages, the court had total discretion whether to award it or not. Okay. But it's not punitive. Anything else, judges? Okay, thank you, ma'am. Thank you. Bergeron, you have three minutes for rebuttal. Starting with the 403 issue, the jury did not understand all this. If the jury had understood all this, we went to the judge in the middle of trial and said, they're opening the door, we need to get this evidence in, and they fought it tooth and nail and the judge wouldn't let us get it in. If the jury already understood it, why would they care? And they cared because they were able at closing argument to attack the credibility of our witnesses, and the judge said when he was discussing harmless areas, he said, well, I don't want to get into revisiting credibility determinations. But that was critical in a bad faith case. And to be able to shore up the testimony of Mr. Morris and Mr. Shockley to show that their conduct was consistent with subsequent actions and to answer that why question was critical. And where she says, well, this could have elongated the trial, I mean, we're talking about two witnesses, maybe three with Mr. Zitkus. They were all already testifying. It's simply going on another line of questioning here. And Journey's other part of the response to that is, oh, my goodness, there was all this other evidence of bad faith. Then why not let us make our defense? Why not let us tell the whole story? They say that, well, it's the time of trespass, that's all that mattered, but it's not as if EQT or any other trespasser wakes up in the morning and says, I'm going to go drill next door. It's all part of a historic understanding, and that's what Kentucky courts have recognized in applying the totality of the circumstances test. The courts routinely look at evidence back in time to understand why did the trespasser do what it did. Let me ask you this. It seems like most of the evidence you're complaining about not having gotten in is extrinsic evidence that would be admissible if there was ambiguity and all like that. Is there significant documentary evidence put aside that would be part of this extrinsic evidence? You're talking about all oral negotiations. What I'm talking about right now would be the oral discussions and oral understandings prior to the time of consummation of the contract. I'm not aware. All your argument about extrinsic evidence is limited to that. That's correct. That's what I'm saying. It should have been that the judge denied under 403 and it should have been allowed. But you had some people at your client like Samuel Smallwood and Michelle Weber. These were land managers, contract managers, who apparently found some questionable things about what property was conveyed or not, and this occurred after 2001. That's right, Your Honor. But I think, remember, the Kentucky test is a good-faith trespasser believes he is right. A bad-faith trespasser knows he is wrong. And there are cases in Kentucky that we cite in our brief that say, look, if there's a dispute, if there's confusion about whether or not you actually have the right to go in there, that's indicative of good faith. Now, ultimately, it's going to be a jury determination at the end of the day. Jury heard that. I guess there's sort of an obligation of due diligence that I guess they felt your client didn't do. That's correct, Your Honor. But I think this goes back to my fundamental point, which is we weren't able to answer the why question and say what is the basis, why did you understand this, and it dates back to prior to execution of the contract. This is what the maps that were drawn that were supposed to encompass the totality of the circumstances or totality of the transaction and the interactions with Mr. Shockley, who went in the data room and saw those contracts and was told that's the deal. Thank you, Your Honors. Thank you. That case will be submitted.